**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 1:22-CV-21631-DPG**

UI TECHNOLOGIES, INC.,
and UI DIGITAL, INC.,

Plaintiffs,

v.

RICOMA INTERNATIONAL CORP.,
GUOFENG "HENRY" MA, and
MIGUEL ANDONI CIARRETA,

Defendants.
_________________________________________/

**PLAINTIFFS, UI TECHNOLOGIES, INC.'S and UI DIGITAL, INC.'S,**
**OPENING CLAIM CONSTRUCTION BRIEF**

Plaintiffs, UI Technologies, Inc., and UI Digital, Inc. (collectively, "UI"), pursuant to this Court's Rescheduling Order dated October 25, 2022 [DE 110], file their Opening Claim Construction Brief as follows:

## I. FACTS[1]

### A. Background of Defendants' Knockoff Printer

*i. The Parties*

UI is a U.S. based original equipment manufacturer that manufactures, distributes, and sells digital color printers, toner cartridges, and related products throughout the United States and the world. UI currently owns 14 issued United States patents related to its printer and toner cartridge technology.

[1] Record citations to UI's Facts were provided to the Court in UI's Proposed Report and Recommendation following the September 6-7, 2022 hearing on UI's Motion for Preliminary Injunction.

Michael R. Josiah ("Josiah") and Joseph Dovi ("Dovi") are the co-inventors of all 14 of the issued UI patents. As discussed below, both have extensive backgrounds in the printer and toner cartridge industry.

Among the many products UI sells is its flagship "iColor Series" branded digital white transfer media printers. These printers, used in the transfer printing market, are instrumental for use in the apparel industry, particularly for printing images onto clear film media that can then be heat transferred onto clothing to create bright graphics. UI sells its printers primarily through written agreements with approximately 86 resellers worldwide.

UI is also the Exclusive Licensee of Lucid Dream Software, Inc., which patented a method for printing digital images using image splitting technology. Referred to as SmartCUT, the Lucid software uses edge mapping technology for reproducing large images across two or more printed transfer sheets, which can then be applied to a surface or garment without creating a visible seam in the image(s).

Defendant Ricoma International Corp., located in Medley, Florida, is in the business of selling Chinese-made embroidery machines and accessories. In or about April 2020, Defendants, who had no prior experience whatsoever in the printer or toner cartridge business, approached UI, purportedly about becoming an authorized reseller for UI's iColor Series digital transfer printers. UI eventually allowed Ricoma to become an authorized reseller of its printers and the Parties signed a written Reseller Agreement. UI trained Defendants' employees and furnished extensive technical specifications and know-how, including knowledge of UI's Patent Portfolio.

*ii. Defendants' Knockoff "Luminaris 200" Printer*

In November 2020, Defendants discovered that they could make more money by competing with UI. Defendants purchased look-alike knockoff printers, instructed employees to copy UI's marketing materials, and directed its foreign software developer to "mimic" UI's printer software and all of its functionality.

Defendants, of course, did not inform UI of their plans to produce and distribute a knockoff of UI's white toner transfer printer. To the contrary, in February 2021, at the same time as Defendants were working with their software developer and others to produce their competing printer, they informed UI of their plans to "ramp up with marketing" and that they were

coordinating with their marketing team to "launch" the iColor 560 Series (the next generation in UI's printer series).

In April 2021, contrary to their stated intentions to "ramp up" and "launch" the iColor 560, Defendants unilaterally terminated the Reseller Agreement. By the next month, Defendants' clone "Luminaris 200," produced quickly due to no need for any research or development because they merely copied the iColor printer, was on the market in competition with UI.

*iii. Defendants' Luminaris 200 Printer Clones UI's iColor Printer*

Defendants' Luminaris 200, like the iColor 560, is a standard CMYK (discussed below) color printer converted to a CMYW white toner transfer printer. Like UI, Defendants procure Ricoh-made printers so that the printers are virtually identical in appearance, both exterior and interior. The Luminaris 200 comes with a Quick Start Guide, which replicates nearly verbatim the graphics, diagrams, charts, and text from the iColor 560 User Manual.

Defendants' printers are sold with its "LuminRIP" software. The print queues in LuminRIP, which include "overprint," "underprint" and standard "CMYK," are identical to that of UI's ProRIP. The appearance and functionality of LumniRIP is identical to ProRIP. According to Joe Dovi, one of the inventors of UI's 14 patents, Defendants copied both iColor Series 560's hardware and software – "They copied our software….There is no question in my mind. It is 100 percent copied beginning to end."

Whereas UI invested 18 months in research and development on its iColor Series 550 printer, Defendants conducted "zero R&D." In sum, Defendants' Luminaris 200 white transfer printer replicates in every material manner UI's iColor 560 printer.

**B. Background of UI's Patented Technology**

Use of white toner in the heat transfer printing process brightens the appearance of other colors, allowing images to stand out when affixed to various surfaces and articles of clothing. Through use of UI's patented technology, white toner can be printed onto the media first, underneath the colored toner (a process UI refers to as "under print printing") or last, over the colored toners ("over print printing").[2]

[2] UI created the terms "underprint" and "overprint" and is currently seeking U.S. Trademark Registrations for those proprietary terms.

UI obtains its iColor Series printers from Ricoh USA, Inc. ("Ricoh"). Ricoh's are standard color printers equipped with "standard" cyan, magenta, yellow, and black toner cartridges, referred to in the industry as CMYK printers. Toner cartridges that are white, clear, fluorescent, metallic (silver or gold), or sublimation are examples of "non-standard" colors.

With Ricoh's permission, UI, using its patented technology, converts these standard color printers into "white toner transfer printers," or CMYW printers. The conversion process involves, among other things, swapping toner cartridges, including interchanging the black toner cartridge (K), with white (W), and using RIP software to instruct the toner cartridges to print from their non-native positions.[3]

RIP software, or a "raster image processor," is software used to convert, or "rasterize," images to digitally map them from screen pixels to print media. RIP software existed prior to UI's patents, but it was used only to process colors and improve resolution. Josiah and Dovi devised a method of using RIP software to "remap" the color toner cartridges into different positions inside the printer, which then allowed for both underprint and overprint printing with the same machine.

Prior to the invention, there existed only dedicated standard color printers and dedicated, purpose-built white toner transfer printers. Those printers came with "drivers," which sent hard-coded instructions for printing colors only from fixed positions within those machines. The toner cartridges in dedicated CMYK and dedicated CMYW printers cannot be interchanged, both because the drivers are incapable of remapping themselves automatically and because they are equipped with "blocking tabs" preventing them from being physically inserted into any other than their original fixed positions within the machine.

RIP software had, until Josiah and Dovi's invention, been used for maintaining color accuracy and resolution enhancement. Never before then had RIP software been used to remap toner cartridges from one slot to another slot, which is how UI obtained 14 patents on the technology.

Because there existed no technology prior to the Patents-in-Suit for converting a CMYK into a CMYW printer, users desirous of standard printing, overprint printing, and underprint printing needed to purchase three separate dedicated printers to perform each of those functions. This required not only a substantial financial investment (white toner transfer printers are priced,

[3] The printer can also be used in "standard" CMYK mode by using the black toner cartridge instead of the white.

generally, in the several thousand-dollar range), but also substantial space and power requirements.[4]

It was also possible, prior to the invention, to overprint with white after laying down the color print job, or underprint with white before the color print job. But both required two passes by the printer, which took twice as long and was inefficient.

UI's patented technology sought to address these long felt needs. With the patented technology, the blocking tabs on the toner cartridges are removed, which allows them to be physically swapped to different positions within the printer. After selecting the desired physical position of the cartridges, the user selects the desired print mode (e.g., underprint, overprint, or standard) and feeds the media (typically a transparent sheet) into the printer. The RIP software remaps the colors accordingly so that when the image is heat transferred from the media onto a garment, all of the colors appear bright and visible. All of this is accomplished in a single pass using only one single converted printing machine.[5]

### C. The Patents Asserted by UI in This Litigation

UI filed this lawsuit on December 28, 2021 alleging that Defendants infringe six of its Patents. UI also filed a Motion for Preliminary Injunction, in connection with which the Court, on September 6-7, 2022, conducted an evidentiary hearing. For brevity, UI asserted only 3 of the 6 patents in this case (out of the 14 issued U.S. Patents that it owns for its printer and printer cartridge technology and printing methodology).

At the Preliminary Injunction Hearing, Defendants, who unabashedly copied UI's technology, were left with little choice but to desperately attempt to challenge the validity of UI's patents – patents that had been examined and approved 14 times by 14 Patent Examiners at the U.S. Patent Office. As part of its validity challenges, Defendants asserted that some of the terms

[4] Multiple machines draw significant power; 2-3 printers could well exceed the power ratings for a home circuit. Prior to the invention, "you would have to have an electrician come in and run dedicated lines for the printers." [Tr. MJ at 150-51].
[5] "Single pass" means the media only passes through the printer once.

in the patents were ambiguous or unclear or that the terms should be construed in a manner that would enable Defendants to avoid infringement.

Accordingly, this Opening Claim Construction Brief focusses on dispelling Defendants' distorted and unsupportable claim term constructions. Defendants' challenges relate at least to claim terms found in U.S. Patent No. 10,649,372 (the '372 Patent, issued on May 12, 2020, attached as **Exhibit A**), U.S. Patent No. 9,835,982 (the '982 Patent, issued on December 5, 2017, attached as **Exhibit B**), and U.S. Patent No. 9,835,968 (the '968 Patent, issued on December 5, 2017, attached as **Exhibit C**).

*'372 Patent*

The '372 Patent is titled, "Method and System for Converting a Toner Cartridge Printer." [Ex. A]. Claim 1 describes Josiah and Dovi's patented method of converting a CMYK toner printer to print with a non-standard toner. The black toner cartridge is removed from the printer and a non-standard color toner is inserted into the empty cartridge position resulting in a converted CMYX non-standard toner printer. RIP software is then used to incorporate the non-standard color toners into an image. The RIP performs cartridge remapping such that the printer prints using non-standard toner from cartridge positions different from those in the original printer.

*'982 Patent*

The '982 Patent is titled, "Method and System for Converting a Toner Cartridge Printer to a White, Clear, Metallic, Fluorescent, or Light Toner Printer." The Background Section of the '982 Patent explains that while white media printers are available, they are dedicated to CMYW only, where white is always a top color, i.e. overprint printing. [Ex. B, col. 1]. Printing on clear or dark media, i.e. underprint printing, may require the user to buy an additional new printer. [*Id.*]

Further, as explained in the Background Section, traditional CMYK printers have only been able to approximate metallic tones by blending CMYK colors. [Id.]. Similarly, because the

primary CMYK colors are designed and tailored for printing bright, vivid, and high chroma graphics on plain paper, those colors do not provide a true photographic lightfastness. [Id. at col. 2]. Thus, the patent reflects a need for a system of converting a standard CMYK toner printer to print using white, metallic, fluorescent, or light toner as a background or foreground color. [Id.].

Claim 1 describes Josiah and Dovi's patented method of converting a CMYK printer to print with a non-standard toner. One of the standard CMY color toners is removed from the printer and a non-standard color toner consisting of either metallic or fluorescent toner is inserted into the empty cartridge position. [*Id*., Col. 23].

*'968 Patent*

The '968 Patent is titled, "Toner Cartridge Printer Devices, Systems, and Methods for Over Printing and Under Printing." This Patent represents the core of UI's patented technology – converting a CMYK color toner printer to a CMYX color toner printer for under print and over print printing in a single pass using cartridge swapping and RIP software.

Before the disclosure of this Patent, toner printers were unable to over print and under print in a single pass. [Ex. C, Col. 1, ll. 45-48]. In order to accomplish both of those types of printing, a user would have had to purchase two different machines. [*Id*., ll. 48-50]. The Patent describes the benefits of under print printing and over print printing in connection with printing on dark media and for heat transfer printing. [*Id*., ll. 51-56]. The invention allows for a single machine or system to be capable to interchange from over printing to under printing and vice versa. [*Id*., Col. 2, ll. 1-3].

## II. LEGAL STANDARDS

Claim construction is a question of law to be determined by the Court. *See Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U,S. 370 (1996). Claim

construction analysis begins by looking to the words of the claims. *See Teleflex, lnc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1324 (Fed. Cir. 2002).

The seminal case of *Phillips v. AWH Corp*. 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) sets forth the applicable standard for construing disputed patent claims. The words of the claims are "generally given their ordinary and customary meanings" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1312-1313. The ordinary and customary meaning of a claim term may be determined solely by viewing the term within the context of the claim's overall language. *See Phillips*, 415 F.3d at 1313 ("[T]he use of a term within the claim provides a firm basis for construing the term."). The use of the term in other claims may also provide guidance regarding its proper construction. *See id*. ("other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term").

As *Phillips* further instructs:

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful. In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.

*See id*. at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).

A claim should also be construed in a manner that is consistent with the patent's specification. *See Markman*, 52 F.3d at 979 (“claims must be read in view of the specification, of which they are a part"). Typically, the specification is the best guide for construing the claims. *See Phillips*, 415 F.3d at 1315. Precedent forbids, however, a construction of claim terms that imposes limitations not found in the claims or supported by an unambiguous restriction in the specification or prosecution history. *Laitram Corp. v. NEC Corp*., 163 F.3d 1342, 1347 (Fed. Cir. 1998).

District courts may also consider extrinsic evidence, such as dictionaries or technical treatises, to understand the underlying technology and the manner in which one skilled in the art might use claim terms. *See Phillips*, 415 F.3d at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field. *Id*.

## III. THE PATENT CLAIM TERMS ARE CLEAR AND UNAMBIGUOUS

The terms used in the Patent Claims are clear and unambiguous, and those terms should be given their plain and ordinary meaning as understood by persons of ordinary skill in the art. Nonetheless, Plaintiffs have identified the following five claim terms, followed by UI’s proposed constructions, to which Defendants have raised challenges and disputes and which therefore may require construction by the Court.

### A.

| | |
|---|---|
| **CMYK toner printer** | a printer installed with cyan, magenta, yellow, and black toner cartridges |

Claim 1 of the ’372 Patent states, in pertinent part:

> A method of converting a CMYK toner printer to print with a non-standard toner, comprising the steps:
>
> providing a CMYK toner printer;

> wherein said CMYK toner printer has four printing cartridges;
>
> wherein said four printing cartridges comprise a black toner printing cartridge, a cyan toner printing cartridge, a magenta toner printing cartridge, and a yellow toner printing cartridge;
>
> ….

There is no ambiguity whatsoever concerning the claim term, "CMYK toner printer," and UI's claim construction, reflecting the plain and ordinary meaning of that term, would be interpreted consistent with the above.

Defendants, however, argue that "CMYK toner printer" should be interpreted to mean that the four printing cartridges must be arranged in a particular color sequence beginning with a cyan toner at one end of the printer, followed immediately adjacent by the magenta, then yellow, and then black toner cartridge at the opposite end from the cyan toner cartridge. See Defendants' Appendix 1. Nothing in the specification or claims supports Defendants' position that the toner cartridges in a CMYK printer are color-sequenced in a particular order and the evidence proves otherwise.

To begin with, the intrinsic evidence, that is, the patent specification itself, which is the "most significant source of the legally operative meaning" of this term, supports UI's interpretation. *See Phillips*, *supra*. The second and third elements of Claim 1 of the '372 Patent define CMYK toner printer as a printer that "has four printing cartridges," which are comprised of a "<u>black</u> toner printing cartridge, a <u>cyan</u> toner printing cartridge, a <u>magenta</u> toner printing cartridge, and a <u>yellow</u> toner printing cartridge." [Ex. A, Col. 14, ll;. 66-67; Col. 15, ll. 1-4]. Critically, nothing within Claim 1 instructs any particular color-sequencing of the toner printing cartridges. Had sequencing been required, the patentees could have readily included words to reflect positioning, e.g., "at one end," "starting with," "followed by," "adjacent to." *See Teleflex, Inc. v.*

*Ficosa N. Am. Corp.,* 299 F.3d 1313, 1327 (Fed.Cir.2002) (holding that claim terms take on their ordinary and accustomed meanings, unless the patentee uses words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope); *see also Alloc, Inc. v. ITC,* 342 F.3d 1361, 1370 (Fed.Cir.2003) ( "[I]t is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention.").

Moreover, the second element of Claim 1 identifies the colors of the toner cartridges in the printer in the order of black, cyan, magenta, and yellow. If, as Defendants suggest, "CMYK" denotes the color sequence in which the cartridges must appear in the printer, the patentees would likely have identified the colors of the toner cartridges in the order of cyan, magenta, yellow, and black. In other words, if "CMYK" denoted color-sequencing of the toner cartridges inside the printer, the patentee described a "BCMY" printer, which, in relationship with this art, is nonsensical and contrary to the overwhelming literature about these colored toner cartridges.

Nor does the specification support Defendants' contention that the toner cartridges must be specifically color-sequenced. The Abstract, for example, defines "CMYK toner printer" in the same manner as does Claim 1. More significantly, Figures 5 and 6 describe an embodiment of a "CMYK toner printer" where "Black may be in <u>any</u> cartridge position."[6] As the Summary of Embodiments explains, "In one embodiment, a standard toner cartridge printer is converted by replacing one of the standard color or black toner printing cartridges, <u>from any slot</u>…." [Ex. A, Col. 2, ll. 47-49]. Another embodiment is described where cartridge remapping is used "to allow a white, clear, or non-standard toner printing cartridge to be put in the 'K' (black) slot (which <u>may</u> be the first slot in the printer) of a CMYK printer…." [Ex. A, Col. 2, ll. 60-63; see also Col. 3, ll.

[6] Emphasis has been added to claim and specification language throughout this brief.

62-63 and Col. 4, ll. 28-29 ("The black toner printing cartridge may be in a first position of the toner printer.")]. The patentees' use of broad, permissive phrases such as "any cartridge position," "from any slot," and "may be in a first position" all belie Defendants' assertion that a "CMYK toner printer" means a printer wherein the color toner cartridges are specifically sequenced.

Indeed, had the patentees intended to limit the meaning and scope of "CMYK toner printer" in any of the claims of any of its 14 patents to require a specific sequencing of the color toner cartridges, they could have and would have selected words of a mandatory nature. They did just that when describing *one* embodiment of the invention, which specifies that "the black toner printing cartridge is in a first position of the toner printer." [Ex. A, Col. 4, ll. 63-64]. The absence of this mandatory language from the patent claims disproves the claim construction advanced by Defendants, while proving that advanced by UI.

Because the intrinsic evidence so clearly disproves any sequencing limitation into the term "CMYK toner printer," it is not necessary to consider extrinsic evidence. Yet it strongly favors UI's interpretation. First, according to Mr. Josiah, who is one of the inventors of these 14 issued U.S. Patents, "CMYK toner printer" is understood by persons of ordinary skill in the art as a printer installed with cyan, magenta, yellow, and black toner cartridges without regard to any specific color sequencing. [Declaration of Michael R. Josiah, attached hereto as **Exhibit D**, ¶ 3].

There are also ubiquitous color toner printers on the market today, all of which are considered "CMYK toner printers," that do not employ the color-sequencing suggested by Defendants. *[Id.*, ¶ 4]. For example, the color toner cartridges inside the HP CP1518, made by Hewlett Packard, are sequenced KCMY. [Josiah Decl., Ex. D, ¶ 5, referencing attached photo]. Conversely, the color toner cartridges inside the OKI 844, made by OkiData, are sequenced KYMC. [Id. at ¶ 6, also referencing attached photo]. *See also* Canon Colorimageclass LBP622CDW and Ricoh SP C840DN, both color sequenced KCMY *[Id.*, ¶ 7, photos attached].

For all of the foregoing reasons, the Court should interpret "CMYK toner printer" consistent with the definition advanced by UI and reject that advanced by Defendants, which impermissibly attempts to limit the scope of that term to a specific color-sequencing of the toner cartridges.

**B.**

| | |
|---|---|
| **CMYX toner printer** | a printer installed with cyan, magenta, yellow, and a non-standard color toner cartridge |

Defendants seek to limit the definition of "CMYX toner printer" in the same manner as they do a "CMYK toner printer," namely, by importing a color-sequencing limitation into the claims. See Defendants' Appendix 1, Claim Construction for '372 Patent. For reasons similar to the above, their argument fails.

The patents broadly cover a method and system for converting a standard CMYK toner cartridge printer into a non-standard CMYX printer where the black toner cartridge (denoted by "K") is removed from the printer and a non-standard color toner (denoted by "X"), such as white, fluorescent, clear, metallic, etc., is inserted into the empty cartridge position.

As explained above, the claims and specification broadly and permissively allow for the positioning of the black toner cartridge within the printer. [Ex. A, Figures 5 & 6, "Black may be in <u>any</u> cartridge position;" Summary of Embodiments, Col. 2, ll. 47-49, "In one embodiment, a standard toner cartridge printer is converted by replacing one of the standard color or black toner printing cartridges, <u>from any slot</u>…;" *Id*., ll. 60-63, cartridge remapping is used "to allow a white, clear, or non-standard toner printing cartridge to be put in the 'K' (black) slot (which <u>may</u> be the first slot in the printer) of a CMYK printer…;" *Id*., Col. 3, ll. 62-63 and Col. 4, ll. 28-29 ("The black toner printing cartridge <u>may</u> be in a first position of the toner printer.")].

The claims and specification of the Patents-in-Suit instruct converting a printer by replacing the black (K) cartridge with a non-standard (X) cartridge. Because that black cartridge may be physically present in any of the slots, the non-standard toner cartridge, which replaces the black, may also be physically present in any of the slots. Thus, just as "CMYK toner printer" does not import a color-sequencing limitation, CMYX toner printer does not. *See* Josiah Decl., Ex. D, ¶ 8.

**C.**

| | |
|---|---|
| **such that said converted CMYX non-standard toner printer prints using said non-standard toner from different cartridge positions** | substitution of the black toner cartridge in a CMYK printer resulting in a converted CMYX non-standard toner printer that will print when the non-standard toner is moved to different cartridge positions within the printer |

Defendants allege that Claim 1 of the '372 Patent, Ex. A, is indefinite because it defines a converted CMYX non-standard toner printer as one where a non-standard toner cartridge has been inserted into the position left empty when the black toner cartridge was removed. They posit that given that definition, the last phrase of the last element of Claim 1, "such that said converted CMYX non-standard toner printer prints using said non-standard toner <u>from different cartridge positions</u>" is not possible. UI does not agree.

First, the Background Section of the '372 Patent explains the need for a printer that can print white both as a "top color" (overprint) and print white in a manner that will allow for "printing on dark or clear media" (underprint). [Ex. A, Col. 2, ll. 18-21]. Further, the Summary of Embodiments describes replacing one of the standard color or black toner printing cartridges "from any slot" with a non-standard toner cartridge and then using RIP software to match or set in which printer slot each of the cartridges resides. [*Id.*, ll. 47-52]. Both of these parts of the specification

indicate to a person of ordinary skill in the art that "different cartridge positions" includes printing when the non-standard toner cartridge is inserted into the position left empty by the removal of the black (element F of Claim 1) and where the non-standard toner cartridge is inserted into a position left empty when removing any of the other standard colors (CMY), i.e. printing "from any slot," meaning printing from "different cartridge positions." Adopting the construction advanced by UI therefore comports both with the understanding of a person of ordinary skill in the art and with what the Patent, as a whole teaches.

**D**.

| | |
|---|---|
| **Fluorescent toner** | toner that glows under a black light |

The '982 Patent, Ex. B, is titled, "Method and System for Converting a Toner Cartridge Printer to a White, Clear, Metallic, Fluorescent, or Light Toner Printer." Claim 1 describes a method of converting a CMYK printer to print with a non-standard toner "selected from the group of non-standard toners consisting of a metallic and a fluorescent toner."

The ordinary meaning of "fluorescent" as understood by a person of ordinary skill in the art is "readily apparent" and claim construction "involves little more than the application of the widely accepted meaning of" that term. *See Phillips, supra*, at 1314.

"Fluorescent" means "appearing very bright when light shines on it; that can be seen in the dark."[7] Fluorescent toner is often used in the transfer printing industry at issue in this case to provide graphics printed on t-shirts, mugs, and other articles with brightness and radiance. [Josiah Decl., Ex D, ¶ 9]. A very common method for determining whether a toner color is fluorescent is to observe whether it glows under a black light, as depicted in the photograph attached to Mr.

[7] https://www.oxfordlearnersdictionaries.com/us/definition/english/fluorescent

Josiah's Declaration. [*Id*., ¶ 10]. If a color toner glows under a black light, it is fluorescent. [*Id*. ¶ 11].

Defendants argue for a claim term construction of "fluorescent" in the '982 that excludes "fluorescent white." Their argument relies solely upon an earlier of UI's patents, which allegedly identified both "fluorescent white" and "fluorescent" toners. Their argument misses the mark.

The claims of the '982 Patent, which is the one at issue in this case despite Defendants' frequent attempts to confuse the Court on that issue, proves that "fluorescent" includes "fluorescent white." Specifically, Claim 5 discloses converting a standard printer by providing and installing three fluorescent non-standard toner printing cartridges. Dependent Claim 6 then delineates the "three fluorescent non-standard toner printing cartridges" as "fluorescent yellow," "fluorescent cyan," and "fluorescent magenta." Thus, "fluorescent" is clearly an "umbrella" term that covers all fluorescent colors, including fluorescent white.

Defendants' reliance on the Field of Use of the '932 Patent is, for several reasons, unavailing. To begin with, that Patent is broadly titled, "Method and System for Converting a Toner Cartridge Printer to a White, Clear, or Fluorescent Toner Printer." If "fluorescent white" is, as Defendants contend, excluded from the construction of "fluorescent," it would have no place whatsoever in that Patent.

More importantly, the specification states, consistent with the title, "It is an object of the present system and method to convert a standard toner cartridge printer into white, clear, or fluorescent toner printer." Col. 4, ll. 43-45. The specification further states, "[r]egarding a FL CMYW printer, the FL stands for fluorescent, wherein the cyan, magenta, yellow, *and/or white toner printing cartridges may be fluorescent*." (emphasis added). When read in its entirety, the specification plainly reflects that "fluorescent" includes "fluorescent white" and that any use of

"fluorescent white" is for purposes of specifying that fluorescent color versus any other fluorescent color (e.g. fluorescent yellow, fluorescent cyan, fluorescent magenta, etc.).

**E.**

| | |
|---|---|
| **position** ('968 Patent) | toner cartridge positions assigned by the order in which toner is applied to the substrate (paper) – e.g., "first position" means the toner cartridge is in the position where that toner will be applied to the substrate first, "last position" means the toner cartridge is in the position where that toner will be applied to the substrate last |

Both the intrinsic and extrinsic evidence support UI's construction of the term "position" in the '968 Patent, Ex. C hereto. First, intrinsically the Patent is titled, "Toner Cartridge Printer Devices, Systems, and Methods for Over Printing and Under Printing." Claim 1 states, in pertinent part:

> A method of converting a CMYK color toner printer to a CMYX color toner printer for over print printing in a single pass, comprising the steps:
>
> ….
>
> removing said black toner printing cartridge from a first toner cartridge position;
>
> removing said cyan toner printing cartridge from a fourth toner cartridge position;
>
> providing a non-standard toner printing cartridge;
>
> installing said cyan toner printing cartridge into said first toner cartridge position;
>
> installing said non-standard toner printing cartridge into said fourth toner cartridge position;
>
> providing a raster image processor software;
>
> wherein said raster image processor software is config-

> ured to remap said four toner printing cartridges of said color toner printer and allows said color toner printer to *print a layer of non-standard toner over an image* in a single pass;
>
> wherein said image is printed from at least one of: a cyan toner, a yellow toner, and a magenta toner.

Claim 8 then instructs, as a further embodiment of the invention, essentially removing the non-standard toner printing cartridge from the fourth position and swapping it with the cyan toner, which is in the first position, and then employing raster image software to remap the four toner printing cartridges "to print a new layer of non-standard toner *under* a second image in a single pass."

As explained above, this Patent represents the core of UI's patented technology – converting a CMYK color toner printer to a CMYX color toner printer for under print and over print printing in a single pass using cartridge swapping and RIP software. Underprint printing denotes that non-standard toner, commonly white, is printed "under" the image (see, e.g., Claim 8, describing printing a layer of non-standard toner under an image), while over print printing denotes printing "a layer of non-standard toner *over* an image" (see, e.g., Claim 1).

These concepts describe the physical placement of the white layer relative to the other colors that are used to create the image (e.g. printing the white layer either under/beneath or over/on top of the image created by the other colors). They are apparent throughout the patent specification.

For example, underprint printing is described by: a) printing "a layer of non-standard toner *beneath* the other colors of the image," [Ex. C, Col. 7, ll. 36-38, 65-67]; and b) using the RIP to allow "the printer to first put down a layer of white, upon which the other colors may print on top of" so that the image is printed with an "under layer of white." [Col. 8, ll. 31-35]. Overprint printing, conversely, is described by using the RIP software to "allow the printer to first put down

the color image and then contemporaneously put a layer of white on top of the color layer all in a single pass of the printer." [*Id.*, ll. 39-42].

The claim terms must be read consistent with the concepts of under print and over print printing and, specifically, with the physical placement of the white toner (e.g. under/beneath or over/on top of) relative to that of the other colors. Thus, "position" denotes print sequencing, i.e., "first position" means the toner cartridge is in the position where that toner will be applied to the substrate first and "last position" means the toner cartridge is in the position where that toner will be applied to the substrate last. This is the only interpretation that will utilize the sequencing teachings of the Patent to print a layer of white either "under/beneath" or "over/on top of" the other colors.

Employing this interpretation, Claim 1 instructs installing the cyan toner printing cartridge into the first toner cartridge position, meaning the position where it will be applied to the substrate first, and installing the non-standard (e.g., white) toner printing cartridge into the fourth toner cartridge position, meaning the position where it will be applied to the substrate last.

From the perspective of an ordinary person skilled in the art, the only way to print a white layer under/beneath a color image is for the RIP software to remap the toner cartridges so that white prints first before the other colors. Therefore, white must be in a "position" where it prints first before the other colors. [Josiah Decl., Ex. D, ¶ 12]. Conversely, a person skilled in the art understands that the only way to print a white layer over/on top of a color image is for the RIP to remap the cartridges so that white prints last. [*Id.*, ¶ 13]. Ergo, white must be in a "position" where it prints last.

Laser printers are also manufactured in different ways. Some print images directly onto the substrate, while others print images onto a transfer belt, which then transfers the image onto the substrate. [*Id.*, ¶ 14.]. The '968 Patent and the other UI patents disclosing this technology broadly

cover under print and over print printing regardless of the type of color printer used and the term construction advanced by UI is consistent with that fact.

Defendants argue that "position" denotes physical slot within the machine. That construction is unconvincing. To begin with, the '982 Patent, which followed and therefore may properly be considered in the construction of the '968 Patent, *see Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 969 (Fed. Cir. 2022, considering patentee's related patents in claim construction), repeatedly describes a "first printing cartridge position" and a "last printing cartridge position." [Ex. B, Fig. 1 at 110, Col. 2, ln. 39, Col. 13, ll. 8, 40; Col.2, ll. 44, Col. 13, ln. 43]. See also same terms in the '372 Patent that also postdated the '968 Patent, Ex. A, Fig. 1 at 110; Col. 2, ln. 55, Col. 10, ll. 23, 26. Thus, "position" clearly instructs a printing sequence (first or last) and not a physical slot within the printer.

In addition, the technology focusses on the use of RIP software to remap the toner cartridges. Remapping allows the printer to change the print sequencing of the toner cartridges regardless of the physical slot in which they are installed in the printer. Defendants' proposed construction of "position" ignores this critical fact and should not be adopted.

## IV. CONCLUSION

The claim terms of each of the asserted patents are clear and unambiguous and do not require any construction. To the extent that claim construction is appropriate, the positions advanced by UI are well-supported both by the intrinsic and extrinsic evidence, while the positions advanced by Defendants improperly attempt to limit the scope of the patent claims and otherwise conflict with the legal standards for claim construction. As such, UI's interpretations should be adopted and Defendants' disregarded.

Respectfully submitted,

By: /s/ *Matthew S. Nelles.*
Matthew S. Nelles
Florida Bar No.: 009245
mnelles@nelleslawfl.com
NELLES LAW GROUP
101 Northeast Third Ave., Suite 1500
Ft. Lauderdale, FL 33301
T: (954) 246-4800; D: (954) 246-4880
Eservice: yberstein@nelleslawfl.com

-and-

HANKIN PATENT LAW, APC
Marc E. Hankin, Esq.
12400 Wilshire Boulevard, Suite 1265
Los Angeles, California 90025
Telephone: (310) 979-3600
marc@hankinpatentlaw.com;
courtfiling@hankinpatentlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 21, 2022, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will serve a copy of the foregoing document on all counsel of record.

By: /s/ *Matthew S. Nelles*
Matthew S. Nelles